## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

      v.                                                                      No. 1:25-cr-03724-KWR

TERROLD TYLER,

      Defendant.

### <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Defendant Terrold Tyler's objections to the Presentence Report ("PSR") (**Doc. 34**). Defendant argues that (1) the PSR improperly enhances his sentence for lack of a serial on his homemade firearm, (2) the record does not support that there was another felony offense, (3) the PSR incorrectly describes the offense conduct because the Government has not met its burden of proving that there was a "shooting" and "victim," and (4) the Government has not proven the existence of the 2015 misdemeanor calculated in Defendant's criminal history.

The Court held a sentencing hearing on December 17, 2025, to consider exhibits and arguments from the parties. At this hearing, the Court reserved its ruling on Defendant's objections. After reviewing the parties' arguments, exhibits, testimony, and the applicable law, the Court **OVERRULES** Defendant's objections.

### BACKGROUND

On September 16, 2025, Defendant Terrold Tyler pled guilty to one count of felon in possession of a firearm and ammunition in violation of 18 U.S.C. §§ 922(g)(2), 924. Doc. 28 (Plea Agreement).

The PSR objections stem from an incident that occurred between Defendant and D.B., another adult male. According to the PSR, on April 29, 2025, Navajo Nation Police Department officers were dispatched to a grocery store after a security guard called to report that someone had been shot in the hand. Doc. 36 ¶ 14. When the officers arrived on scene, an officer noticed Defendant—who matched the description of the reported shooter—turn away from them, walk away, and drop a backpack. *Id.* ¶ 15. Officers made contact with D.B., who told them that Defendant had shot him with a shotgun after they had been arguing. *Id.* ¶ 16. D.B. described the shooting and showed them his hand, which had a small wound and some dried blood. *Id.* Although he initially assisted in the investigation, D.B. wouldn't cooperate with medical personnel, eventually stated that he didn't cooperate with police, and walked away from the scene. *Id.* ¶ 17. Officers located Defendant and the backpack. *Id.* ¶¶ 15, 18. Inside the backpack, officers found a homemade pipe shotgun, five live 20-gauge shotgun shells, two rounds of .22 caliber ammunition, and other items. *Id.* ¶ 15. Defendant denied ownership of the backpack, knowledge of the firearm, and ownership of any firearms. *Id.* ¶¶ 18–19.

Defendant was charged with felon in possession of ammunition, under 18 U.S.C. §§ 922(g)(1), 924. Doc. 28 at 3. On September 16, 2025, he pled guilty. *Id.* at 1. In his plea agreement, Defendant admitted to ammunition possession and a prior felony conviction. *Id.* at 4. Defendant also admitted to knowing it was illegal to possess ammunition, and that the ammunition was not manufactured in New Mexico. *Id.* at 4–5.

Based on Defendant's guilty plea and evidence uncovered during discovery, the U.S. Probation Office ("USPO") applied a base offense level of 14. Doc. 36 ¶ 27. As relevant here, the USPO applied a four-level enhancement under § 2K2.1(b)(4)(B)(ii) because Defendant knew or should have known that the firearm lacked a serial number, and a four-level enhancement under

§ 2K2.1(b)(7) for possessing a firearm or ammunition in connection with another felony offense. *Id.* ¶¶ 28–29. Defendant's criminal history was computed at four for prior convictions, including a 2015 state conviction for battery. *Id.* at 8–10.

On December 3, 2025, Defendant filed five objections to the PSR. Doc. 34. The Government filed its response, rejecting four of Defendant's objections.  Doc. 37 at 3–4.  The Probation Office responded in the PSR addendum, respectfully rejecting the same objections.  Doc. 33 at 2.  And the Government lodged exhibits to support its response.  Doc. 41; Doc. 42.

On December 17, 2025, the Court heard arguments on Defendant's objections to the PSR and the factual basis for the offense conduct described in the PSR. Doc. 44, 5:9–13 (Clerk's Minutes); Doc. 45 (Hearing Transcript). During the hearing, the Court received testimony from SA Andrew Wright, SA Michael Mostaghni, and Gary Ainsworth and took the matter under advisement.

## LEGAL STANDARD

A sentence must be procedurally and substantively reasonable. *United States v. Haley*, 529 F.3d 1308, 1311 (10th Cir. 2008).  "A sentence is procedurally unreasonable if the district court incorrectly calculates or fails to calculate the Guidelines sentence, treats the Guidelines as mandatory, fails to consider the § 3553(a) factors, relies on clearly erroneous facts, or inadequately explains the sentence." *Id.* (citing *Gall v. United States*, 552 U.S. 38, 50–51 (2007)). Procedural reasonableness also requires that the district court "afford the defendant his rights under the Federal Rules of Criminal Procedure." *United States v. Martinez-Barragan*, 545 F.3d 894, 898 (10th Cir. 2008) (quoting *United States v. Geiner*, 498 F.3d 1104, 1107 (10th Cir. 2007)) (citation modified).

When any portion of the PSR is disputed, a sentencing court's fact-finding obligation is triggered, and the Court must either "rule on the dispute" or "determine that a ruling is

unnecessary." Fed. R. Crim. P. 32(i)(3)(B); *United States v. Chee*, 514 F.3d 1106, 1114–15 (10th Cir. 2008).  A ruling is unnecessary "either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing." Fed. R. Crim. P. 32(i)(3)(B).  "[A] defendant does not 'dispute' a PSR's recitation of facts underlying his arrests unless he presents 'information to cast doubt on' the facts." *United States v. Warren*, 737 F.3d 1278, 1285–86 (10th Cir. 2013) (citing *United States v. Yates*, 22 F.3d 981, 989 (10th Cir. 1994)).  "If a PSR is *not* disputed in this fashion, it is well established that a district court is free to rely on the PSR at sentencing." *Warren*, 737 F.3d at 1286; *see also United States v. Tindall*, 519 F.3d 1057, 1064 (10th Cir. 2008).

The government must prove any findings necessary to support an enhancement by a preponderance. *United States v. Munoz Tello*, 531 F.3d 1174, 1181 n.12 (10th Cir. 2008) (citing *Tindall*, 519 F.3d at 1063. The government must prove disputed facts by a preponderance of the evidence. *See Tindall*, 519 F.3d at 1063.  "The district court may base its findings of fact at sentencing on evidence presented at trial, undisputed statements in the PSR, and evidence presented at the sentence hearing." *United States v. White*, 663 F.3d 1207, 1216 (11th Cir. 2011).

## DISCUSSION

Four of Defendant's objections are disputed.[1] Defendant argues that: (1) the PSR improperly enhances his sentence for lack of a serial on his homemade firearm, (2) the record does not demonstrate that there was "another felony offense" to support an enhancement, (3) the PSR incorrectly describes the offense conduct because the Government has not met its burden of proving that there was a "shooting" and "victim," (4) and the Government has not proven the

---

[1] In Defendant's fifth objection, he argued that he should only receive one criminal history point, not two points, for a dismissed parole violation. Doc. 34 at 7. The Government and USPO agreed, and the PSR reflects the now-resolved objection. Doc. 38 at 3; Doc. 36 ¶ 43.

existence of the 2015 misdemeanor calculated in Defendant's criminal history.  Doc. 34 at 1–6. The Court will address each PSR objection in turn.

## I.       Objection 1 is overruled.

First, the parties disagree over whether Defendant should receive a four-level enhancement for possession of a firearm without a serial number under§ 2K2.1(b)(4)(B)(ii). This disagreement raises issues of first impression.

The firearm is "a homemade pipe shotgun, consisting of metal pipes put together, which was never required under federal law to bear a serial number."  Doc. 34 at 1–2; *see also* Doc. 35 at 4–5. Also known as a "slam-fire gun," a user operates the firearm by placing a round of ammunition between the two pipes, with one pipe designed to slide over the other, and then slamming the pipes together. Tr. 8:19–23.  The parties do not dispute that the homemade firearm lacked a serial number and that Defendant knew of its absence. Rather, they argue about how the Court should interpret and apply § 2K2.1(b)(4)(B)(ii).  Doc. 38 at 1; Doc. 35 at 5.

Defendant has made several written and oral arguments in Objection 1. He contends that an enhancement under § 2K2.1(b)(4)(B)(ii) does not apply because (1) the enhancement does not include privately made firearms that do not require serial numbers by law, (2) the Government has failed to prove that Defendant did not know that the firearm was required to have a serial number, and (3) the Government has not met its burden of proving that the firearm was manufactured after the effective date of the Gun Control Act of 1986 ("GCA").  The Government contends that applying the enhancement to the firearm is consistent with the text and purpose of § 2K2.1(b)(4)(B)(ii) and that the conduct at issue (owning a firearm without a serial number) does not have to be illegal for an enhancement to apply.  Doc. 35 at 5.  For the reasons discussed below, the Court agrees with the Government's arguments.

The Court must "interpret the Sentencing Guidelines as though they were a statute or court rule, with ordinary rules of statutory construction." *United States v. Holbert*, 285 F.3d 1257, 1260 (10th Cir. 2002) (citing *United States v. Tagore*, 158 F.3d 1124, 1128 (10th Cir. 1998)); *see also United States v. Thomas*, 939 F.3d 1121, 1123 (10th Cir. 2019). Further, the Court "must interpret and apply the sentencing guidelines in a manner consistent with the Sentencing Commission's intent." *United States v. O'Flanagan*, 339 F.3d 1229, 1235 (10th Cir. 2003) (citing *Holbert*, 285 F.3d at 1259). To discern intent, the Court looks "not only to the language in the guideline itself, but also to the Sentencing Commission's interpretive and explanatory commentary to the guideline." *United States v. Sweargin*, 935 F.3d 1116, 1121 (10th Cir. 2019). And if the language is unambiguous, it must be followed "except in the most extraordinary situation where [it] leads to an absurd result contrary to clear legislative intent." *Holbert*, 285 F.3d at 1260 (quoting *Tagore*, 158 F.3d at 1128).

Here, the enhancement applies if "the defendant knew that any firearm involved in the offense was not otherwise marked with a serial number (other than a firearm manufactured prior to the effective date of the Gun Control Act of 1968) or was willfully blind to or consciously avoided knowledge of such fact." § 2K2.1(b)(4)(B)(ii). Defendant's arguments depend on the function and meaning of the text appearing in the parenthetical.

Parenthetical text in statutes and the Guidelines can serve different purposes. *See, e.g.*, *Chickasaw Nation v. United States*, 534 U.S. 84, 90 (2001) (example), *United States v. Dowell*, 430 F.3d 1100, 1111–12 (10th Cir. 2005) (descriptive reference), *Thomas*, 939 F.3d at 1127–28 (scope expansion). And courts should treat a parenthetical as substantive unless doing so would conflict with the unambiguous meaning of the text. *Thomas*, 939 F.3d at 1126–27 (discussing *Chickasaw Nation*, 534 U.S. 84). In § 2K2.1(b)(4)(B)(ii), "other than a firearm manufactured prior

to the effective date of the Gun Control Act of 1968" is offset as a parenthetical. Looking to the ordinary meaning of the language, "other than" means "besides, except, apart from." *Other Than*, Oxford          English          Dictionary,          https://www.oed.com/dictionary/other_adj? tab=meaning_and_use#33046060 [https://perma.cc/5EWB-WRPX]. Accordingly, as the parties do not dispute, the parenthetical serves as an exception to "any firearm involved in the offense was not otherwise marked with a serial number," which immediately precedes the parenthetical. The use of a parenthetical, rather than a comma, is likely to improve readability. *See Thomas*, 939 F.3d at 1127. And it visually indicates that the exception applies to the closest antecedent. *See Boechler, P.C. v. Comm'r of Internal Revenue*, 596 U.S. 199, 204–05 (2022).

Thus, § 2K2.1(b)(4)(B)(ii) requires two elements: (1) that the firearm does not have a serial number and (2) that the defendant knew, was willfully blind to, or consciously avoided knowing of the serial number's absence. The enhancement creates one exception: it does not apply when the offense involves a firearm manufactured before the effective date of the GCA.

With this basic interpretation of § 2K2.1(b)(4)(B)(ii) in mind, the Court will turn to Defendant's individual arguments as to how the enhancement should be interpreted and applied in this case.

**A.      The Court rejects Defendant's argument that § 2K2.1(b)(4)(B)(ii) does not apply to homemade firearms lawfully without a serial number.**

First, Defendant argues that the Commission did not intend to include privately made firearms that do not require serial numbers by law. Doc. 34 at 1–2. The Government contends that § 2K2.1(b)(4)(B)(ii) is properly applied in this case and that, for the purpose of sentencing, the lawfulness of the lack of serial number is not relevant to the applicability of the enhancement. Doc. 35 at 5–7.

The Court notes that Defendant's argument would require reading additional meaning into § 2K2.1(b)(4)(B)(ii) beyond its plain text. The language unambiguously applies when a firearm does not have a serial number, and a defendant knows or should know of its absence, unless the firearm was manufactured before the GCA's effective date. And its application of the enhancement to a slam-fire gun is not contrary to § 2K2.1(b)(4)(B)'s purpose of discouraging the use of untraceable weaponry in criminal activity. *See United States v. Seesing*, 234 F.3d 456, 460 (9th Cir. 2000).

Even if the language was ambiguous, the recent history of § 2K2.1(b)(4)(B) demonstrates that the enhancement applies to privately made firearms like the slam-fire gun. Defendant asserts that the enhancement does not apply to firearms that never had a serial number. But Defendant relies on cases decided before the Commission amended § 2K2.1(b)(4)(B). *See* Doc. 34 at 2. Before November 2023, the enhancement only applied when a firearm had "an altered or obliterated serial number." U.S. Sentencing Commission, *Official Text of Amendments to the Sentencing Guidelines* 32 (2023) https://www.ussc.gov/sites/default/files/pdf/amendment-process/official-text-amendments/202305_Amendments.pdf [https://perma.cc/E7ZQ-JGE8]. But as of November 1, 2023, the Commission determined that the enhancement would also apply if "the defendant knew that any firearm involved in the offense was not otherwise marked with a serial number (other than a firearm manufactured prior to the effective date of the Gun Control Act of 1968) or was willfully blind to or consciously avoided knowledge of such fact." § 2K2.1(b)(4)(B)(ii) (2023). The text of the enhancement or commentary did not narrow the enhancement to any other factual scenario. *See* § 2K2.1 cmt. n.8(A)–(B) (providing guidance on interaction with § 2k2.1(a)(7) and knowledge requirement of (b)(4)(B)(ii)).

Before November 2023, circuit courts determined that, because the language clearly only applied to firearms with altered or obliterated serial numbers, § 2K2.1(b)(4)(B) did not apply to firearms without serial numbers, despite the lack of logical distinction between a firearm with a serial number that someone altered or obliterated and a firearm without a serial number by someone's design; circuit courts were bound by the clear language of the enhancement. *See United States v. Laughrin*, 438 F.3d 1245, 1248–49 (10th Cir. 2006), as amended (Mar. 16, 2006); *United States v. Bakhtiari*, 913 F.2d 1053, 1063 (2d Cir. 1990). This pre-2023 text created a loophole that frustrated the purpose of the enhancement, which could only be closed by the Commission. *Laughrin*, 438 F.3d at 1249 (noting that Commission's choice to not amend § 2K2.1 to include firearms that never had a serial number indicated the Commission's "apparent agreement" with previous circuit decisions); *Seesing*, 234 F.3d at 460 (noting that the purpose of the enhancement is frustrated by plain language of § 2K2.1(b)(4)(B), which did not apply to a homemade silencer without a serial number).

In the 2023 amendment, it does not appear that Commission intended to modify the purpose of § 2K2.1(b)(4)(B). Rather, it intended to close the loophole recognized by the courts. In its reasoning, the Commission stated that "the amendment amends § 2K2.1 to account for privately made firearms not marked with a serial number, commonly referred to as 'ghost guns.'" U.S. Sentencing Commission, *supra*, at 40. It did not define "privately made firearms." After summarizing the changes to § 2K2.1(b)(4)(B), the Commission concluded that "there is no meaningful difference" between two firearms where one has an altered or obliterated serial number and the other has no serial number, *id.*, consistent with circuit court decisions. The Commission also concluded that firearms without a serial number "share the traits" that led to the enhancement

9

for altered or obliterated serial numbers in the first place: the difficulty tracing them, the increased use in connection with criminal activity, and the increased market for them. *Id.*

Thus, based on the existing caselaw and the text of the official amendment, the 2023 amendment served to close a loophole that frustrated the purpose of the enhancement.

Further, it appears that the Commission intended for the newly amended language to apply broadly to all privately made firearms. The Commission did not define "privately made firearms" or the nickname "ghost gun" in its reasoning for the 2023 amendment. But the Commission was likely aware that the regulations governing the Alcohol Tobacco and Firearm define a "privately made firearm" as:

> A firearm, including a frame or receiver, completed, assembled, or otherwise produced by a person other than a licensed manufacturer, and without a serial number placed by a licensed manufacturer at the time the firearm was produced. The term shall not include a firearm identified and registered in the National Firearms Registration and Transfer Record pursuant to chapter 53, title 26, United States Code, or any firearm manufactured or made before October 22, 1968 (unless remanufactured or remade after that date).

27 C.F.R. § 478.11 (2026). Because the Commission did not indicate that the amendment should be limited to a subset of privately made firearms (except for the specific exception for firearms manufactured before the GCA's effective date), the Commission contemplated that the enhancement would include a homemade slam-fire gun.[2]

Accordingly, the Court rejects Defendant's argument that the enhancement only applies to privately made firearms that require serial numbers. As Defendant points out, not all personal firearms, built after the GCA's effective date, require serial numbers. *See* Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24652, 24673 (April 26, 2022) (noting that "[n]either the GCA nor this rule prohibits law-abiding citizens from completing, assembling, or

---

[2] For this reason, the Court declines to address the parties' dispute at the hearing over whether Defendant's slam-fire gun needed a serial number under ATF regulations.

transferring firearms without a license as long as those persons are not engaged in the business of manufacturing or importing firearms for sale or distribution, or dealing in firearms, or transacting curio or relic firearms in a manner requiring a license" (citing 18 U.S.C. §§ 922(a)(1), 923(a)–(b))).  Yet, the Commission did not create an exception for privately made firearms that do not need serial numbers, despite the statutory carveout and prior circuit court decisions. *See Seesing*, 234 F.3d at 460 (holding that § 2K2.1(b)(4)(B) enhancement did not apply to a homemade silencer). The 2023 amendment only created an exception for firearms manufactured before the GCA's effective date.[3] Therefore, as discussed above, limiting § 2K2.1(b)(4)(B)(ii)'s application to firearms unlawfully without a serial number would impose a limitation not expressly articulated by the Commission and in conflict with the enhancement's history and purpose.

Thus, the Court finds that—based on the text, purpose, and history of the enhancement— the Commission intended § 2K2.1(b)(4)(B)(ii) to apply broadly to combat the untraceable weaponry used to commit crimes, including the slam-fire gun involved in Defendant's case.

**B.      The Court rejects Defendant's argument that a defendant must know that the firearm needed a serial number.**

Next, Defendant argues that the enhancement does not apply because there is no evidence that Defendant *knew* that the slam-fire gun needed a serial number.  Tr. 85:25–86:2. Because the Court has already determined that the Commission did not intend to exclude post-GCA privately made firearms that do not need serial numbers, the Court rejects Defendant's argument to the extent that it requires that the Court interpret § 2K2.1 beyond its plain text—that Defendant must

---

[3] This was the issue in *Laughrin*, 438 F.3d 1245. Thus, the 2023 amendment expressly adopts the Tenth Circuit's interpretation that § 2K2.1 did not intend to include firearms manufactured before a serial date was required to be printed on them, withdrawing its "apparent" agreement with prior circuit court decisions. *See id.* at 1250.

11

know that the firearm needed a serial number by law, regardless of its manufacture date. Thus, looking to the enhancement's plain language, Defendant's remaining interpretation would now require that he have knowledge of the language preceding the parenthetical (the requirement that the firearm lacked a serial number) *and* the language inside the parenthetical (the exception for a firearm manufactured before GCA's effective date).

Here, the Court finds that the Commission's use of the parenthetical was intended to convey to the reader that the knowledge requirement only applies to "any firearm involved in the offense was not otherwise marked with a serial number"—a noun phrase appearing in the middle of the sentence and directly preceding the parenthetical. Further, the enhancement only requires that a defendant "knew" or "was willfully bind to or consciously avoided knowledge of" a single "fact." *See* § 2K2.1(b)(4)(B)(ii). Accordingly, based on a plain reading of the enhancement, the Government does not have to prove both that Defendant knew that a firearm was not marked with a serial number and that Defendant knew that the firearm was not manufactured before the GCA's effective date.

This interpretation is supported by the Commission's description of the 2023 amendment, which separately describes the knowledge requirement and the GCA exception:

> The Commission determined that the enhancement should apply only to those defendants who knew or consciously avoided knowing that the firearm was not marked with a serial number. The amendment also specifically excepts firearms manufactured before the effective date of the Gun Control Act of 1968, which imposed the requirement that federal firearms licensees serialize newly manufactured or imported firearms.

U.S. Sentencing Commission, *supra*, at 41.

In sum, the Court finds that § 2K2.1(b)(4)(B)(ii) merely requires that Defendant knew that the firearm did not have a serial number; it does not require Defendant to know that the firearm needed a serial number because it was manufactured after the GCA's effective date.

**C.** **The Court rejects Defendant's argument that the Government must prove that the gun was manufactured after the effective date of the GCA.**

Finally, as to Objection 1, Defendant argues that the Government did not prove that the gun was made after the GCA's effective date. *See* Tr. 86:17–23. The Government conceded that it presented no evidence that the firearm had been made after 1968, although there was a lack of visible rust or corrosion on the firearm. *Id.* 86:17–23.

The text and commentary of § 2K2.1(b)(4)(B)(ii) do not specify which party has the burden of proof. For Defendant's argument to succeed, the enhancement must place the burden on Government. If the GCA's effective date was an element of the enhancement, the Government would likely have that burden. *See United States v. Munoz Tello*, 531 F.3d 1174, 1181 n.12 (10th Cir. 2008) (citing *United States v. Forsythe*, 437 F.3d 960, 963 (10th Cir. 2006)). But, as the Court concluded above, the language at issue is an *exception* to the enhancement, not an *element* of the enhancement, due to the Commission's use and location of a parenthetical that begins with "other than." Accordingly, the Government is not necessarily required to have that burden.

Here, the Court finds that once the Government presents evidence of a defendant's knowledge of the firearm's lack of serial number, the burden shifts to the defendant to prove that the exception applies—that the firearm was manufactured before the GCA's effective date. The Court's determination is consistent with burden-shifting requirements of other exceptions to enhancements. *See, e.g.*, *United States v. Roberts*, 980 F.2d 645, 647 (10th Cir. 1992) (once government met burden, defendant must show that exception applies as to U.S.S.G. § 2D1.1(b)(1)); *United States v. Hanson*, 534 F.3d 1315, 1317 (10th Cir. 2008) (defendant bears burden of showing sporting exception applies under § 2K2.1(b)(2)); *cf. United States v. Wilson*, 17 F.4th 994, 1004 (10th Cir. 2021) (once government established drug possession amount at

13

sentencing, defendant had burden of proving that some should be excluded as personal use). This burden-shifting framework also makes practical sense since a defendant is the party with knowledge of when and how a firearm was acquired by the defendant. And determining the manufacture date would not place an undue burden on a defendant, who under other circumstances would be able identify the manufacture date of a firearm based on the photographs of the firearm provided by the Government and testimony by an expert.

In arguing that the Government has failed to meet the burden, Defendant has not put forth any evidence to demonstrate by a preponderance of the evidence that the slam-fire gun was manufactured before the effective date of the GCA. Accordingly, the Court finds that the exception does not apply to Defendant's case.

Therefore, based on the application of Defendant's case to the text of § 2K2.1(b)(4)(B)(ii), the enhancement applies. The Court overrules Objection 1 to the PSR because the elements are met; the slam-fire gun lacked a serial number, and Defendant knew that the slam-fire gun lacked a serial number.

## II.    Objections 2 and 3 are overruled.

Next, Defendant challenges the PSR's description that Defendant shot D.B. with the slam-fire gun (Objections 2 and 3). *See* Doc. 34 at 3–5. According to Defendant, he only pled to possession of ammunition, and the plea agreement does not identify a shooting and a victim. *Id.* at 3; Tr. 91:13–15. And the Government cannot meet its burden by proving that the facts in PSR Paragraphs 14–22, 24, and 109 occurred by a preponderance of the evidence. Doc. 34 at 5; Tr. 90:11–16. To that end, Defendant asserts that an enhancement under U.S.S.G. § 2K2.1(b)(7) does not apply since the record fails to support that he committed the offense (felon in possession of ammunition) in connection with another felony offense (assault with a dangerous weapon in Indian

Country). In response, the Government contends that it has met its burden based on the exhibits in the record and testimony presented at the hearing. Tr. 87:14–22.

The Court will first address Defendant's objection to the facts in the PSR (Objection 3) before turning to his objection to the enhancement under § 2K2.1(b)(7) (Objection 2).

Defendant contends that the Government cannot prove by a preponderance of the evidence that a shooting occurred and that D.B. is a victim. Although the Government demonstrated that the slam-fire gun can operate as a firearm, Defendant states that this "does not establish that it was discharged during this incident, that it caused any injury, or that Mr. Tyler used it against [D.B.]." Doc. 34 at 3. For example, Defendant pointed out that D.B. never identified Defendant by name, the observed wound on D.B.'s hand was small and not actively bleeding, no witnesses ever identified Defendant as a shooter, and no evidence corroborated that a shooting occurred. *Id.* Moreover, D.B.—who reported the shooting—later recanted his earlier testimony. *Id.* at 3–4. The Government disagrees with Defendant's arguments in full.

Defendant has sufficiently raised a specific factual dispute as to whether a shooting occurred, resulting in injury to D.B. This triggers the Court's factfinding duty under Fed. R. Crim. P. 32(i)(3)(B). *See United States v. Tindall*, 519 F.3d 1057, 1062 (10th Cir. 2008). Thus, the Court will not merely rely on the facts in the PSR, and the Government will bear the burden of proving by the preponderance of the evidence facts supporting the sentencing enhancement. *See United States v. Ruby*, 706 F.3d 1221, 1227 (10th Cir. 2013).

To resolve the factual dispute, the parties presented evidence and testimony at the hearing. FBI SA Andrew Wright and FBI SA Michael Mostaghni testified for the Government as to the incident and the firearm, respectively. Gary Ainsworth testified for Defendant as to the firearm. The Government also presented several exhibits, including surveillance video from Bashas' on

April 29, video of D.Y.'s interview by officers on May 1, the Shiprock Incident Report Form, an undated TikTok video of Defendant with the slam-fire gun, a test fire video by SA Mostaghni, and audio of D.B. recanting his April 29 statements. *See* Doc. 42 (Exhibit List). None of the exhibits or testimony provided direct evidence that a shooting occurred on April 29 and that D.B. was injured in the shooting. However, for the reasons below, the Court finds that D.B.'s statements to D.Y. and officers, plus the corroborative evidence, make it more likely than not that the shooting occurred.

First, the Court finds D.Y.'s recounting of the incident to be reliable. At sentencing, a court may consider hearsay statements if they "bear some minimal indicia of reliability." *United States v. Leib*, 57 F.4th 1122, 1128 (10th Cir. 2023); U.S.S.G. § 6A1.3.  The Court reviewed the video interview of D.Y., where the Court was able to observe D.Y.'s demeanor. *See United States v. Stapp*, No. 24-7009, 2025 WL 1113927, at *5 (10th Cir. Apr. 15, 2025) (noting that statement on camera corroborated earlier statement and allowed court to observe demeanor). The interview matched D.Y.'s other statements in the Shiprock Incident Report Form, including the reporting call and April 30 interview. Further, D.Y. was a neutral party, who did not know either Defendant or D.B., Doc. 42-3 at 14:50–14:53, and had no reason to lie, *see Ruby*, 706 F.3d at 1229–30.

Additionally, the record tends to "buttress," rather than "undermine" the Court's confidence in D.Y.'s testimony. *See United States v. Fennell*, 65 F.3d 812, 813 (10th Cir. 1995) (finding no minimal indicia of reliability of single report when there was no sworn testimony, officer did not observe demeanor and could not form opinion as to veracity, and no other corroborating evidence existed). Although the surveillance video does not fully capture the events, it is consistent with D.Y.'s interview. The viewer can see a person matching Defendant's and the shooter's description (wearing a gray shirt, black pants, and white shoes) walking around and

arguing with D.B. outside Bashas'. Doc. 42-4 at 1:02–1:18, 2:19–2:26. Defendant can be seen wearing a backpack matching the description of the backpack described by D.Y., D.B., and responding officers. *Id.* And the video footage captures D.Y. watching Defendant and D.B. argue, followed by D.B. entering the store and gesturing and talking to D.Y. Doc. 42-5 at 1:30–1:54. After listening to D.B., D.Y. is seen pulling out his phone to make a call as he walks offscreen. *Id.* at 2:00.

The dispatch and incident reports, upon which SA Wright's testimony was partially based, are also sufficiently reliable as they match the description of the events by D.Y., the evidence gathered on scene, and the resulting arrest and charges. *See* Doc. 42-12.

Next, the Court finds that D.B.'s statement meets the minimal indicia of reliability required at sentencing. D.B. reported that Defendant shot him with a makeshift shotgun behind Little Ceasar's restaurant, injuring him in his left hand. Doc. 42-12 at 4, 7. According to the PSR, D.B. reported the shooting to two individuals, first to D.Y. shortly after the incident (who then reported the incident to police) and then to the officers when they responded to the call (who then documented the incident in the police dispatch report). Doc. 36 ¶¶ 16, 20. Again, the Court is satisfied that D.Y. reliably relayed D.B's statement to police. And D.B.'s statements reported by D.Y. and responding officers are consistent with one another. And D.B. did not make the call that reported the shooting to police, which tips his telling of events towards reliability. *See United States v. Lujan*, No. 22-2157, 2024 WL 1905672, at *3 (10th Cir. May 1, 2024). Rather, D.B. contemporaneously told D.Y. of the shooting right after he is seen arguing with Defendant. *See United States v. Farnsworth*, 92 F.3d 1001, 1010 (10th Cir. 1996).

The Court does not find that D.B.'s testimony must be disregarded because he later recanted his testimony. It appears that D.B. became uncooperative, and later recanted, once he

17

understood that police wanted his cooperation. *See Leib*, 57 F.4th at 1129 (finding no bias because witness declined to testify against defendant after reporting offense). The Court finds that it is more likely that D.B. was telling the truth to D.Y. just after the event and to officers when they arrived, before he realized that he would be asked to cooperate and potentially testify against D.B.

And Defendant's statement does not cast doubt on D.B.'s telling of the incident. Both parties admit to arguing right before D.B. reported the incident. But only D.B.'s story aligns with the evidence on the record. Defendant asserts that D.B. threw the backpack in his direction when they saw the officers, and that he had never touched the backpack, leaving it on the ground. Doc. 42-10 at 1. This directly contradicts the evidence on the record that he was seen wearing the backpack by two individuals. And the Court can view Defendant wearing the backpack in Bashas' surveillance footage. Doc. 42-4 at 2:22. Defendant also stated that he hadn't touched a firearm in years, before he later admitted to touching a homemade shotgun the day of the incident because D.B. showed it to him. Doc. 42-10 at 2. This is contradicted by the TikTok video and officer report several hours before the incident. *See* Doc. 42-12 at 6.

Next, the Court finds that the evidence demonstrates that Defendant was in possession of the firearm both before and after the reported shooting, which corroborates D.B.'s account that a shooting occurred. Defendant was seen with the slam-fire gun hours before the incident. Doc. 42-12 at 5. Video footage from Bashas' lobby show the firearm is sticking out of the backpack as Defendant walks past the front of Bashas'. Doc. 42-4 at 2:33. D.Y. also reported seeing Defendant wearing the backpack with pipes visibly sticking out when Defendant was outside Bashas', after the shooting but before the officers arrived on scene. Doc. 42-3 7:52–8:08. And when officers responded to D.Y.'s call, an officer observed Defendant wearing a backpack with pipes sticking out upon arrival. Doc. 42-12 at 6. The officer saw Defendant, after noticing the officers, walk away

18

and drop the backpack containing the firearm. *Id.* This suspicious activity indicates that Defendant knew that officers were arriving because of an incident involving the slam-fire gun. *See United States v. Martinez*, 824 F.3d 1256, 1262 (10th Cir. 2016). Further, an undated TikTok video showed Defendant holding the slam-fire gun, Doc. 42-8—directly contradicts Defendant's post-arrest interview where he said that he had only touched the firearm once at D.B.'s house on the date of the incident, Tr. 25:7–19.

The Court also disagrees with Defendant that D.B. did not identify Defendant as the shooter. Although the Government did not provide clear evidence linking Defendant to the alias "Smokey," D.B. told a responding officer that "Smokey" shot him and that the backpack found on scene belonged to "Smokey." Doc. 42-12 at 7. According to D.Y., when D.B. reported to D.Y. that someone had shot at him, he pointed towards Defendant, told D.Y. what the shooter was wearing (which matched Defendant's clothes), and said that the shooter had a "makeshift shotgun." Doc. 42-3 at 9:53–10:16. Further, in the police dispatch report, D.Y. identified the shooter as "Harold Tyler," Doc. 42-12 at 4, which is phonetically similar to Defendant's name, Terrold Tyler.

Finally, the Court finds that the Government has met its burden of proving the nexus between the ammunition and the shooting. SA Wright testified that Defendant knew how to operate the slam-fire gun. Tr. 26:1–6. Video footage of a firearm functionality test by SA Mostaghni, principal firearms and tactics instructor for the FBI, confirmed that the firearm functioned. Doc. 42-13; Tr. 38:18–19, 46:6–8. And the Court finds that the firearm could have fired the 20-gauge ammunition found in the backpack. Although testimony by SA Mostaghni demonstrated that 12-gauge ammunition fit the slam-fire gun, and Defendant stated that the firearm shot 12-gauge ammunition, SA Mostaghni's testimony also confirmed that the firearm functioned with 20-gauge ammunition. Tr. 53:18–55:06. The Court finds that this testimony is sufficient to establish that

19

Defendant shot D.B. with 20-gauge ammunition carried in the backpack, even though the functionality test with the 20-gauge ammunition was not captured on video.

Looking at the totality of the circumstances, the Court finds that there is sufficient corroborative evidence independent of D.B.'s unsworn statements for the Government to meet its burden of proof. Although the Court agrees with Defendant that the Government could have provided more evidence to strengthen its argument—like witness testimony of the shooting, a shotgun casing, pellets, and fingerprints—the Government is not required to prove the existence of a shooting and victim beyond a reasonable doubt. Here, the Government has provided enough evidence to demonstrate that it is more likely than not that the facts described in Paragraphs 14–22, 24, and 109 of the PSR occurred. Accordingly, the Government has met its burden of the preponderance of the evidence and Objection 3 is overruled.

Because the Court overrules Objection 3, the Court also overrules Objection 2. Based on the facts in the PSR, there is sufficient evidence to support an enhancement under § 2K2.1(b)(7) because the offense (felon in possession of ammunition) in connection with another felony offense (assault with a dangerous weapon in Indian Country).

### III.    <u>Objection 4 is overruled</u>.

Finally, Defendant objects to the USPO's inclusion of a 2015 misdemeanor conviction in its calculation of his criminal history. Here, the Court finds that the Government has met its burden; the NCIC report and the court docket are enough to establish the 2015 conviction.

As an initial point, Defendant incorrectly states that the misdemeanor (battery) should be excluded unless it resulted in probation of more than one year of imprisonment of at least thirty days.  As the Government points out, that exception only applies to certain misdemeanors. *See*

Doc. 35 at 9.  Battery is not one of the listed misdemeanors.  *See* U.S.S.G. § 4A1.2(c)(1). Therefore, if proven, the misdemeanor offense should be included regardless of the length of sentence.

"Whenever a prior conviction is relevant to sentencing, the government must establish the fact of that conviction by a preponderance of the evidence." *United States v. Martinez-Jimenez*, 464 F.3d 1205, 1209 (10th Cir. 2006) (citing *United States v. Cooper*, 375 F.3d 1041, 1052 (10th Cir. 2004)).  Evidence of a prior conviction must be supported by "sufficient indicia of reliability to support its probable accuracy." *United States v. Zuniga-Chavez*, 464 F.3d 1199, 1203 (10th Cir. 2006) (quoting § 6A1.3(a)).  The district court's determination of whether evidence is sufficiently reliable to establish a prior conviction is a factual matter that is reviewed for clear error. *See Martinez-Jimenez*, 464 F.3d at 1209–10.

In *Martinez-Jimenez*, the district court relied on an NCIC report and letter from the state court that confirmed the conviction. *Id.* at 1207–08.  First, the Tenth Circuit noted that multiple circuit courts, in unpublished opinions, have held that NCIC reports, or other "computer reports or printouts," alone could establish the existence of a conviction, absent any contradictory evidence. *Id.*  Next, the Tenth Circuit found that the district court was "even more conservative than those held in the above-cited cases not to be clearly erroneous." *Id.* at 1211.  Since the district court considered both the NCIC report and letter together, there was sufficient information to establish that the defendant's conviction was not clearly erroneous. *Id.* at 1212.

Here, the Government submitted electronic versions of the NCIC record excerpt and state court docket. *See* Doc. 41-1; Doc. 41-2.  First, Defendant's personal information in the NCIC excerpt and the court docket match the information in the PSR, including the photograph, date of birth, social security number, and driver's license number. *See United States v. Thomas*, 611 F.

21

App'x 508, 511 (10th Cir. 2015) (noting that the personal information in online report from state database matched PSR to find that the government met its burden).

Next, the offense information on the NCIC excerpt and the court docket are sufficiently similar. The NCIC excerpt shows the arrest date (June 4, 2015), case number (151002388), and arresting agency (Farmington Police Department). It also shows the charge (battery in violation of NMSA 1978, Section 30-03-04 (1963)). The arrest date and offense (battery) are the same on the New Mexico court docket. The docket provides further information, like the plea, disposition, and sentencing dates, along with the conditions ordered.  Although the case numbers are slightly different (case number is M-147-MR-2015-00384 on the docket) and court docket does not explicitly say that the Farmington Police Department is the arresting agency, the Court does not find that these differences are fatal to the Government's argument considering the supporting information and lack of other contradictory information.

Importantly, Defendant does not argue that he is not the person referred to in the docket or that the conviction never occurred. *See* Doc. 34 at 8; *Martinez-Jimenez*, 464 F.3d at 1212.  Since Defendant has not presented information that he is someone other than the person in the submitted NCIC excerpt and court docket—or that he is someone other than the person convicted of the misdemeanor—the Court finds that, when viewed together, the documents show that the Government has met its burden of proving the existence of the 2015 misdemeanor conviction.

## CONCLUSION

For the reasons discussed above, the Court overrules Defendant's Objections 1 to 4. The Court will set a sentencing hearing by separate order. The Court will hear any remaining arguments at that hearing.

**IT IS SO ORDERED.**

_____/S/_____
KEA W. RIGGS
UNITED STATES DISTRICT JUDGE